**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240289-U

Order filed December 5, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0289 Circuit No. 05-CF-751 |
| IGNACIO C. JACOBO, | ) ) ) | Honorable David M. Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Presiding Justice Brennan and Justice Hettel concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The court did not err by denying defendant's postconviction petition claim of ineffective assistance of counsel after a third-stage evidentiary hearing.

¶ 2    Defendant, Ignacio C. Jacobo, appeals the Will County circuit court's denial of his postconviction petition following a third-stage evidentiary hearing. He argues that the court erred by finding that trial counsel was not ineffective for failing to file a motion to suppress his statements based upon trickery and deceit by detectives, including false promises of leniency. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4         Defendant was charged with four counts of first degree murder (720 ILCS 5/9-1(a)(2),

(a)(3) (West 2004)) and one count of aggravated arson (*id.* § 20-1.1(a)(2)) arising from the

deaths of Maria DeLourdes Nunez and Merary Nunez, which were caused by a fire at their home

at 419 Madeline in Joliet. Trial counsel filed a motion and amended motion to suppress

statements defendant made to police. The motion argued that defendant did not knowingly and

voluntarily waive his *Miranda* rights based on his age, education, knowledge and experience

with the criminal justice system, duration of the interview, and English language skills. The

motion specifically argued that a sheriff's deputy acted as a Spanish language interpreter,

defendant was informed of his rights in "Spanglish," the interpreter issued legally deficient rights

based on his language skills, and that defendant only had a third-grade education.

¶ 5         The court held a hearing on the motion during which the court heard testimony from the

officers involved in interrogating defendant, as well as an individual who transcribed the

interview. The court also read the transcript and reviewed the video of the interview. The court

found that "at no time did the officers make any comment to the defendant that would give rise

to such threat or coercion that it would remove the voluntariness from the statements made by

the defendant." The court also found that "all the statements made by the defendant and the

waiver of his rights pursuant to Miranda were voluntarily made." The court denied the motion to

suppress.

¶ 6         The matter proceeded to a jury trial. Adriana and Baltazar Perez, who are Maria's

children and Merary's siblings, testified that there had been prior incidents with gangs at their

house. Baltazar testified that he had pretended to be a member of the Latin Kings gang. He

testified that his home was in the 2-6 gang's territory and that the 2-6 gang was an enemy of the

Latin Kings. Baltazar also testified that there were members of the Vice Lords gang in his neighborhood and that the Vice Lords were also enemies of the Latin Kings. Baltazar was having trouble with a person named Alberto, who was a 2-6 gang member.

¶ 7        Shauna Chevalier testified that she was in her car near her boyfriend's house, which is one house away from 419 Madeline, when she heard glass breaking. She looked to see where the noise was coming from and saw a fire at 419 Madeline. She saw two individuals running away right after she heard the glass shatter. One individual was wearing a grey sweatshirt, and the other individual was wearing a white sweatshirt. Chevalier testified that they were Hispanic. Later she testified that she believed she told the police that the two individuals she saw were either white or Hispanic males. Chevalier said she saw dark hair, so she assumed they were Hispanic. She followed them in her car and saw them getting in a truck parked at the corner of Comstock and Madeline. The vehicle immediately drove away. Chevalier described the vehicle as "a white Jeep looking truck, red interior." She followed them to get a license plate number and gave the plate number to the police. Chevalier was asked to go to the police department to look at a vehicle. She viewed a white Jeep SUV and identified it as the vehicle she saw on Comstock. During her testimony, Chevalier identified photographs of the vehicle.

¶ 8        Jose DeJesus Rodriguez testified that he had owned a white Jeep Cherokee with a red interior. He knew defendant and had known him since they were children in Mexico. He testified that defendant and Juan Santana lived in the same building. Rodriguez identified photographs of his vehicle, including the license plate number. On the relevant night Rodriguez went to Sergio Anguiano's house. Defendant and Santana were there when he arrived. Defendant asked Rodriguez to borrow his vehicle, but Rodriguez gave the keys to Anguiano because Anguiano had not been drinking. Anguiano, Santana and defendant left in Rodriguez's vehicle. Anguiano

3

was driving, Santana was next to him and defendant was in the back seat. They were gone for about 30 minutes. Anguiano was driving when they came back. When Anguiano, Santana, and defendant returned to Anguiano's house, defendant smiled and said, "The house is very lit." Rodriguez stated that he did not know what that meant at the time but that later the three of them started talking about what they had done. The next day defendant called Rodriguez and told him that if he talked to the police his family would pay the price. Rodriguez was shown three articles of clothing which he described as a gray sweatshirt, a light blue jacket and a gray sweater. He had never seen those items or put them in his truck. Defendant had told Rodriguez several times that he was a gang member and that if Rodriguez wanted to become a member of the Vice Lords, defendant could get him in without any problems. Santana was also a member of the Vice Lords. Defendant and Santana "were always flashing gang signs." Rodriguez did not think Anguiano was a gang member.

¶ 9       The parties stipulated that two grey sweatshirts and a light grey sweatshirt were collected from the rear compartment of Rodriguez's vehicle. The sweatshirts were admitted into evidence. The sweatshirts were the articles of clothing identified by Rodriguez during his testimony.

¶ 10      Anguiano testified that he was in custody on four counts of first degree murder and one count of aggravated arson. He agreed to testify in exchange for a plea deal. Anguiano knew defendant, as they were friends and came from the same village. On the relevant date, Anguiano had friends over including defendant, Santana, and Rodriguez. At some point, defendant asked for a ride home. Anguiano's vehicle did not have gas. Rodriguez gave Anguiano the keys to his vehicle, a white Cherokee. Anguiano testified that he took defendant and Santana to defendant's house. Defendant and Santana went into the house and came back about five minutes later. Anguiano testified that they asked him to take them someplace else. He followed their directions

4

and stopped where they asked him to stop. He knew the area but did not know the name of the street. Anguiano stated that he knew Adriana Perez. He had given her a ride to her house many times, and the area where defendant asked him to stop was near Adriana's home. It was maybe one block away, and he was stopped at the corner. Anguiano testified that when he stopped the vehicle, defendant and Santana exited. He did not see where they went. They came back about five minutes later. Anguiano stated that defendant was out of breath when he came back. Anguiano then drove them back to his house. When Anguiano first spoke to the police, he did not tell them the whole truth because he was afraid. He stated that he was afraid "because I had taken them close to the house, and I wasn't sure if they were responsible or not." Anguiano testified that in a statement to police he said that he spoke with Santana, and Santana stated that they could blame the entire incident on defendant.

¶ 11        Bruce Larson testified that he was a police officer and had special training in fire investigations. He investigated the fire at 419 Madeline. A landscaping rock was found in the debris near a window that was located off of the porch. Larson testified that due to the odor of gasoline and information that "a rock had been thrown through the window and then a bottle had been thrown through the window," officers were led to the conclusion that "it was an intentionally-set fire using an accelerant to make the fire burn rapidly."

¶ 12        David J. Margliano testified that he was previously employed with the Channahon Police Department and was assigned to the Will County Gang Suppression Unit. He was qualified as an expert on the subject of street gangs. He testified that in Will County, the Vice Lords and the Latin Kings do not always get along. Rival gangs retaliate against each other. The neighborhood where 419 Madeline is located is a Vice Lords neighborhood. Margliano testified that a Latin Kings gang member living in a Vice Lords neighborhood would have problems, and the Vice

5

Lords would attempt to get a Latin Kings family out of their neighborhood. He stated that a Molotov cocktail is the most prevalent weapon used in arson cases that are affiliated with gang crimes. A Molotov cocktail is a glass bottle filled with gasoline. A rag is then inserted into the bottle. Once the rag is soaked with gasoline, it is ignited and can then be thrown.

¶ 13      Rose Hensley testified that she was an interpreter for the Will County Circuit Court. She performs Spanish to English and English to Spanish interpretations. She was employed to review the videotapes of defendant's police interview and translate and transcribe them. She translated the Spanish into English and then transcribed all of the conversations. She identified the transcript. The transcript was admitted into evidence.

¶ 14      Detective Scott Cammack testified that he investigated the fire at 419 Madeline. During the investigation, defendant was identified as a suspect and an arrest warrant was obtained for him. Defendant was located in Colorado. When he was apprehended, he provided a false name and false ID. Cammack, along with Detective Marc Reid, conducted a videotaped interview of defendant. A sheriff's deputy from Colorado acted as the translator. Cammack testified that at some point in the interview they determined they no longer needed a translator. Cammack stated that this was because it became obvious that defendant understood the questions being asked and would start to answer before the question was translated. Additionally, the detectives felt that defendant was using the extra time it took to translate the questions as an opportunity to come up with the answers. Cammack identified the videotapes of the interview, and they were admitted into evidence. The jurors were given a copy of the transcripts of the interview that were prepared by Hensley. The videotapes were played for the jury.

¶ 15      The transcripts reveal that the detectives told defendant that something bad happened in Joliet because of a 27 year old guy and a 24 year old guy. They told defendant those guys have

6

problems with the police. They said that defendant was a young man and the older guys were very bad. The police told defendant he was not a bad man and he was a victim of the older guys. They told defendant that Anguiano said Santana did a bad thing, and that defendant was not guilty for this problem. They repeated that defendant was not guilty, that Anguiano and Santana "did this thing" and defendant "did not do this thing." One of the detectives told defendant:

> "Yes, [Anguiano] says Santana did this stuff, you did not do this stuff. [Anguiano] talked with the police. Not you, Santana. Now here is the deal, you did not do this stuff. Santana did this thing, Santana threw the bomb, and we want to know the truth. You did not do anything wrong. We want you to be a witness for us. Being in the car is not wrong. Santana threw the bomb, so we don't want you to be in jail with Santana we want you to be with us. We want you to tell us the truth. You are either with Santana or with us. I know because Santana was talking. He was telling everybody I did it. Santana was doing this. Not you. Now I need to know, did you throw the bomb or not."

Defendant replied that he "didn't do anything." The detective responded:

> "Good then you can be with us, with the truth. We will put Santana over here and you will be with us, but we have to have truth, because if you are with us and Santana is over there, we have to be able to say, he didn't lie, no lies, he was a little afraid when we got him but now he is with us. But I have to know, did Santana do this thing?"

Defendant denied doing anything and denied knowing whether Santana did. The detective stated, "The way this works is that a person can be with us. It is very important that you talk to us and tell us the truth. I don't want to talk to [Anguiano]. The police want to talk to the good guys not

7

the bad ones. You are a young man and we always try to help the young ones first. The good guys are with the police, the bad guys are not. You have to look after yourself." Defendant again repeated that he did not do anything. The detective stated:

> "Other persons saw you with this guy. *** When you get to Joliet you, [Anguiano] or Santana will be with us, not all three. You, Santana and [Anguiano]. Okay. Santana will be in prison until the day he dies. There is no reason for you to do that, you don't need to be in jail. You need to tell us the truth about this night."

Again, defendant reiterated he did not do anything. When asked if there was a reason the detectives would find defendant's fingerprints in the Jeep, defendant responded that he had been in the vehicle once because he needed a ride home. The police said that "I think that if someone saw it but did not do anything, if someone saw but did not throw it they are in no trouble." The detective told defendant that Anguiano said "Santana threw it" and defendant did nothing. He told defendant "Santana is going to prison forever." The detective told defendant,

> "[Anguiano] says Santana threw it, [Anguiano] says you did nothing, you just stood there, and you said 'oh' nothing bad, no throwing. But you know what, Santana is the bad one. He is 27 he is an old guy. You're a young guy. Santana go to jail forever. [Anguiano] he was driving. He will get a slap on the wrist. You were not driving, he was driving, he says, you no throwing, all you did when you saw you said ah he is loco and run. *** You got to decide today if you are going to be with us and tell us this or we just go and we can't tell anyone that you did not do it."

Defendant stated that he did not do it. The detective told defendant:

"You need to come with us on this and tell us what happened so we can write a report. Say, ah, no throw the cocktail, no drive the car, oh my God he is loco and run. If you don't tell us was [*sic*] happened you are going to go with Santana, you are going to get the hard time, not this, this, he knows he's been bad but him forever in jail, you have got to decide if you are going with us or going with him. You have to tell us what happened because you have been lying ***."

The detective showed defendant a drawing and showed where 419 Madeline was on the drawing. Defendant showed where and how the vehicle was parked. Defendant denied seeing Santana get out of the vehicle. Defendant said he did not know what happened and he just wanted a ride home. Defendant said Anguiano was driving, Santana got out of the vehicle and defendant did not do anything. The detective told defendant "All I want to be able to do is tell the boss, he did nothing, Santana did this, ***?" Defendant stated that he saw something in Santana's hand but he did not know what; however, he then said it was maybe a glass coke bottle. The detective told defendant he did not have problems with the police and that he did not do anything. The detective said:

"We need to tell the court, not [defendant], [Anguiano] says Santana threw the bottle, not [defendant], but I cannot tell him. We came all the way here, me and him flew all the way here in an airplane because Santana needs to go to prison forever. [Anguiano] will get this because I have got to be able to tell them we need you as a witness when Santana threw the bottle you say, no man."

Defendant responded that Santana did not tell him what was going to happen. Defendant told Santana to come with him and asked what was happening and then he saw the house on fire. Defendant stated that afterwards Santana was laughing and said, "Latin King down." The

9

detective told defendant that he knew defendant threw a rock through the window. Defendant denied throwing the rock. The detective again said that defendant threw the rock, not to hurt but to help. The detective told defendant that defendant told a lot of the truth and that he knew defendant was a good guy. Defendant again denied throwing anything. The detective said, "We need to know the truth about the rock. We haven't written any reports yet. We write them later, when we can say Santana said this. [Defendant] is not lying. [Defendant] says good stuff." Defendant denied throwing the rock at the window. Defendant said that he saw Santana throw the rock. Defendant eventually admitted that he picked up a little rock and threw it.

¶ 16    Following the State's presentation of evidence, defense counsel renewed the motion to suppress statements. The court denied the motion. Defendant also moved for a directed verdict, which the court denied. Defendant did not testify and did not present any evidence. The jury found the defendant guilty of all charges. Defendant filed a motion for new trial, arguing that the State failed to prove him guilty beyond a reasonable doubt and that the court erred by denying his motion to suppress statements. The court denied the motion. The court sentenced defendant to life without parole for the murder convictions and 30 years' imprisonment for aggravated arson.

¶ 17    Defendant appealed. This court affirmed in part, vacated two of the murder convictions and the aggravated arson conviction, and remanded for proceedings on defendant's *pro se* claims of ineffective assistance of counsel. *People v. Jacobo*, No. 3-08-0088 (2009) (unpublished order under Illinois Supreme Court Rule 23). On remand, the court found that there was no merit to defendant's claims of ineffective assistance of counsel and entered its judgment on two counts of first degree murder, consistent with this court's order. Defendant appealed, and this court affirmed. *People v. Jacobo*, 2012 IL App (3d) 110047-U.

¶ 18  Defendant, as a self-represented litigant, filed a postconviction petition for relief. The postconviction petition was ultimately advanced to second-stage proceedings. See *People v. Jacobo*, 2016 IL App (3d) 140150-U. Counsel was appointed to represent defendant. Counsel filed an amended and second amended petition for postconviction relief. As relevant here, the petition argued that defendant's trial counsel provided ineffective assistance by failing to file a motion to suppress statements based upon trickery and deception. The petition alleged that defendant's statement to police was not voluntary. The petition noted that at the time of the interrogation defendant was 18 years old, had little education, and did not have the ability to read English. It stated that the officers conducting the interrogation used trickery and deception. Specifically, the petition alleged that the officers indicated they had evidence that defendant did nothing wrong, and the officers lied or made up facts to overcome the will of defendant. The petition included a new motion to suppress as an exhibit. The matter proceeded to a third-stage evidentiary hearing.

¶ 19  Defendant testified that at the time he made his statements to the police, he was 18 years old and had a third-grade education. He knew a little English, and his major language was Spanish. Prior to the hearing on his motion to suppress, neither of his trial counsel went over the motion with him. Defendant testified that officers told him they had statements on an audio recording from him admitting his involvement. At the time, he did not know that the officers were lying to him. He felt that he was fooled and tricked. Defendant was also told that the officers had an independent witness that said he threw a rock toward the house, and he did not know that they did not have such a witness. The officers also told him several times that Santana was going to get a life sentence, that he did nothing wrong, that he was one of the good guys, and that they wanted to save him from being in jail. These statements made defendant feel like "they

11

were going to get the other person." Defendant stated that he did not understand his rights. Defendant testified that the officers told him he was only a witness and they only wanted him as a witness. He eventually felt compelled to tell the officers what they wanted to hear. He believed he was going to be released if he told the officers what they wanted to hear. The officers indicated that Santana and Anguiano were going away for the rest of their lives but not him.

¶ 20        Steven Whitmore testified that he represented defendant during trial. He was second chair and Michael Renzi was the lead attorney. Prior to trial, counsel made a motion to suppress statements, alleging that the waiver of *Miranda* rights was not knowingly, intelligently, and voluntarily made based upon improper admonishments, a language barrier, and defendant's age and education level. Whitmore testified that he believed they discussed the motion with defendant prior to the hearing and would have told defendant they were filing the motion. He did not recall going through the motion but was sure they did. Prior to drafting the motion to suppress, counsel viewed the video of the interview. There was nothing on the video that would make him believe that he would have been successful on a motion to suppress based on trickery. If there would have been, he would have made such a motion. Whitmore testified that officers can make misrepresentations to suspects in custody and that it is a common interrogation technique. It was his understanding that a suspect can be told that the police believe he did nothing wrong. Nothing on the videotaped interview led him to believe that the officers crossed any lines regarding their statements to defendant. Whitmore testified that nothing prohibited him from making a motion arguing that defendant was tricked or deceived but at the time, he did not see anything that would rise to that level. Renzi was the lead attorney, so he would have had more of a role in deciding what motions to file. Whitmore agreed that the officers lied to defendant during the interview. Whitmore testified that at the time the motion to suppress was

12

filed he believed the central issue was the language barrier, and that is why the language barrier was the focus of the motion. Whitmore still held that opinion. Whitmore testified that as an attorney, he typically does not make motions that he does not believe have merit. He did not believe that the questioning of defendant by police rose to the level of trickery or deception. That is why he did not argue that issue.

¶ 21       During argument, defendant's counsel stated, "Now would I have necessarily thought about trickery or deception? Would I even have thought about it today until I saw it in one of the Appellate Court records? Maybe. Maybe not. But it doesn't mean it should not have been advanced." Counsel asked the court to consider the statements by officers telling defendant there was evidence that did not exist and that they only wanted him as a witness. Counsel argued that he believed there were promises in that the officers inferred they would release defendant. The State argued that nothing rose to the level of trickery or deception. The State further argued that this was a trial tactic. Defense counsel argued this was not a trial tactic because it is counsel's job to put all legal issues before the court. The court denied the postconviction petition. Defendant appeals.

¶ 22                               II. ANALYSIS

¶ 23       Defendant argues that the court erred by denying his third-stage postconviction claim that trial counsel was ineffective for failing to file a motion to suppress his statements to police. He argues that counsel should have filed a motion to suppress based upon trickery and deceit. Specifically, defendant argues that the officers made several false promises of leniency over the course of the interview. Defendant argues that the police assured him he would not go to jail if he helped the police. After arguing that the motion to suppress was meritorious, defendant summarily states, without further elaboration or argument, that but for counsel's failure to file

13

the motion to suppress, the interrogation would not have been admitted and the result of the proceeding would have been different.

¶ 24 "[A]t a third-stage evidentiary hearing, the defendant must show, by a preponderance of the evidence, a substantial violation of a constitutional right." *People v. Williams*, 2017 IL App (1st) 152021, ¶ 22. "When a petition is advanced to a third-stage, evidentiary hearing, where fact-finding and credibility determinations are involved, we will not reverse a circuit court's decision unless it is manifestly erroneous." *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). However, where pure questions of law are presented, we generally apply a *de novo* standard of review. *Id.* "Typically, review of a claim of ineffective assistance of counsel involves a mixed question of law and fact, and therefore, a hybrid standard of review would apply." *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 55.

¶ 25 "To establish a claim of ineffective assistance of counsel, a defendant must prove both deficient performance and prejudice." *People v. Smith*, 195 Ill. 2d 179, 187-88 (2000). "Counsel's performance is measured by an objective standard of competence under prevailing professional norms." *Id.* at 188. "[E]ffective assistance of counsel refers to competent, not perfect, representation." *People v. Palmer*, 162 Ill. 2d 465, 476 (1994). There is a "strong presumption that counsel's performance fell within a wide range of reasonable professional assistance." *Id.* "To show actual prejudice, defendant must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Horton*, 143 Ill. 2d 11, 23 (1991) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "With regard to the filing of a motion to suppress, the decision whether to file such a motion is generally 'a matter of trial strategy, which is entitled to great deference.' "

14

*People v. Gayden*, 2020 IL 123505, ¶ 28 (quoting *People v. White*, 221 Ill. 2d 1, 21 (2006), *abrogated on other grounds by People v. Luedemann*, 222 Ill. 2d 530 (2006)). "In order to establish ineffective assistance based on counsel's failure to file a suppression motion, the defendant must demonstrate both that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Gayden*, 2020 IL 123505, ¶ 28.

¶ 26 Here, although trial counsel filed and argued a motion to suppress for failure to comply with *Miranda*, based on defendant's age, education, and a language barrier, trial counsel failed to include argument regarding trickery and deceit based upon false promises of leniency by the police. On various occasions during the interview, the police indicated that they wanted defendant to be a witness and that he should not be in jail. Their statements indicated that if defendant cooperated he would not go to jail while Santana would spend the rest of his life in jail. These statements implicitly promised defendant that if he told them what they wanted to hear, that he would be a witness and would not be sent to jail. Based on these statements by the police, counsel should have filed a motion to suppress based upon false promises of leniency and the failure to do so constituted deficient performance.

¶ 27 However, although we conclude counsel's performance was deficient, we agree with the State that defendant has failed to demonstrate prejudice. As stated above, defendant must not only show that the motion would have been successful, but also that there was a reasonable probability that the outcome of the trial would have been different had his statement been suppressed. See *Gayden*, 2020 IL 123505, ¶ 28. Defendant fails to make any argument in his opening brief that the outcome of the trial would have been different, and instead, makes one

conclusory statement that "the result of the proceeding would have been different." This is a conclusion rather than an argument.

¶ 28    Regardless, we conclude that, even if counsel would have filed the motion to suppress based upon trickery and it would have been granted, defendant cannot establish a reasonable probability that the outcome of the proceedings would have been different. At trial, Rodriguez testified that defendant asked to borrow his vehicle and he gave Anguiano the keys. Anguiano left with defendant and Santana. When they came back, defendant said to Rodriguez, "The house is very lit." Rodriguez also testified that defendant called him and threatened his family if he spoke to the police. Additionally, Rodriguez testified that defendant was a member of the Vice Lords. Anguiano's testimony partially corroborated Rodriguez's testimony, in that he testified that Rodriguez gave him the keys to his vehicle and he left with defendant and Santana. Anguiano further testified that he drove them to their home and then to another location. He parked at the corner near Adriana's house. Anguiano testified that defendant and Santana exited the vehicle and came back a few minutes later. Defendant was out of breath. Chevalier partially corroborated Anguiano's testimony when she testified that after hearing glass break, she saw two Hispanic males running away. She followed them and saw them get into Rodriguez's vehicle, which was parked at the corner of Comstock and Madeline. Although Anguiano was an accomplice and his credibility could be questioned, his testimony was corroborated, in part, by both Rodriguez and Chevalier. Additional testimony revealed that 419 Madeline was in Vice Lords territory and that one of the males that lived at that location pretended to be a member of the Latin Kings. The Latin Kings and the Vice Lords do not get along, and the Vice Lords would want to get any Latin Kings out of their territory. Additionally, defendant fled to Colorado where he was apprehended and provided a false name and identification to law enforcement. This

16

evidence is sufficiently strong that there is not a reasonable probability that the outcome would have been different had defendant's statement been suppressed. This is especially so considering defendant's interview, which he believes should have been suppressed, was not highly incriminating as defendant continually denied culpability and essentially only admitted to being there and throwing a little rock. As defendant failed to establish prejudice, the circuit court properly denied his postconviction petition.

¶ 29   In sum, although defendant demonstrated that counsel's failure to file a motion to suppress based upon trickery and deceit amounted to deficient performance, he failed to establish prejudice because the evidence at trial was strong enough that there is no reasonable probability that the outcome of trial would have been different had defendant's statements been suppressed. Thus, defendant did not establish ineffective assistance of counsel, and the court did not err by denying defendant's postconviction petition.

¶ 30                                III. CONCLUSION

¶ 31   The judgment of the circuit court of Will County is affirmed.

¶ 32   Affirmed.

17